ANN ROSE McGOUGH v. MICHAEL JAMES McGOUGH.

249 N. W. 2d 885.

January 7, 1977—No. 46334.

*Geraghty, O'Loughlin & Kenney, J. H. Geraghty,* and *David C. Hutchinson,* for appellant.

*Oppenheimer, Wolff, Foster, Shepard & Donnelly* and *William P. Studer,* for respondent.

Heard before Rogosheske, Peterson, and Todd, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

This appeal by defendant, Michael J. McGough, requires a review of the reasonableness of the trial court's awards of alimony and property to plaintiff, Ann R. McGough, subsequent to her divorce by a Connecticut court decree in September 1972. We hold that the awards made to plaintiff comply with the statutory standards of reasonableness, are well within the discretionary authority vested in the trial court, and reflect a due regard for all the facts and circumstances found by the court. On plaintiff's notice of review, we further hold that the trial court was justified in denying plaintiff's claim for interim support between the date of divorce and time of trial sought under the terms of an antenuptial agreement executed by the parties.

Plaintiff was 47 years old when she married defendant, then 72 years of age, in New Haven, Connecticut, on November 17, 1967. This was the first marriage for plaintiff and the second for defendant, whose first wife had died in June 1962. Although the parties are first cousins, it is undisputed that their marriage was validly contracted under the laws of Connecticut.

Defendant is a lifelong resident of Minnesota. At the time of his marriage he had a substantial estate, estimated at $550,000, acquired primarily from a construction business. In contrast, plaintiff had lived her entire life on the east coast and had accumulated assets worth $15,000 from her earnings as a high school foreign language teacher.

Since defendant's first wife had provided the initial capital for his business, he desired to preserve his estate for the benefit of the five children of his prior marriage. Accordingly, the parties executed an antenuptial agreement whereby each spouse relinquished all claims against the estate of the other. Included in

the agreement were defendant's express promises to support and maintain plaintiff from his personal funds until either he or she died, to devise to her by will a life estate in 80 acres of farm property located near Rush City, Minnesota, and to bequeath to her the personal property located thereon at his death. No provision was made in the agreement respecting the parties' rights and obligations in the event of divorce or separation.

Following the marriage, plaintiff continued to teach school in Connecticut while defendant maintained his residence on the Rush City farm. The parties ordinarily lived together during the winter months when defendant would move to Connecticut, and plaintiff spent most of her summer vacations on the farm in Minnesota. Since defendant had considerable investment experience and plaintiff had none, he undertook, at her request, to invest certain of her funds in order to build her estate. As found by the trial court, plaintiff, between November 1967 and June 1971, gave to defendant for investment purposes $36,312.10, representing virtually her entire earnings during the marriage. Instead of investing those funds, defendant deposited them into a checking account in Connecticut over which he had sole signatory power. He also commingled at least $37,000 out of his own personal funds by deposits in that account. Checks were drawn to pay the monthly living expenses of the parties, to make charitable contributions, and to purchase government bonds in defendant's name at a cost of $12,300. When the account was closed in June 1971, only $507.34 remained.

On September 22, 1972, plaintiff was awarded a default divorce by the Superior Court of the County of New Haven, Connecticut. Because of jurisdictional impediments, no alimony or property claims were litigated in that court. On May 31, 1973, plaintiff commenced this action to enforce her equitable rights to permanent alimony and a property division, and for an accounting or return of the money given to defendant for investment. Thereafter, plaintiff alleged in an amended complaint that she was entitled to support for the period of time between the

Connecticut divorce and date of trial, pursuant to defendant's antenuptial promise to support her.

In addition to the facts referred to above, the court found that at the time of trial plaintiff was earning an annual income of approximately $15,500 and had a total net worth of approximately $15,000. Plaintiff's monthly expenditures to support herself averaged $700. Defendant received an income ranging from approximately $24,000 to $40,000 during the years of marriage and still had a net worth of approximately $544,000.

As conclusions of law, the court determined that defendant breached his agreement to invest plaintiff's funds and ordered him to repay the $36,312.10, with interest from and after the judgment. Plaintiff was further awarded permanent alimony of $300 a month, commencing after entry of judgment and terminating on the death of plaintiff or defendant, and a life estate in defendant's Rush City farm together with all personal property located thereon at the time of defendant's death. Without explanation as to the reason therefor, the court also determined "[t]hat the antenuptial agreement between the parties was terminated by the divorce obtained by Plaintiff."

Defendant's appeal challenges the justification and reasonableness of each of the awards to plaintiff. Plaintiff seeks review of the trial court's denial of her claim for support and maintenance during the period following the parties' divorce to the date of trial.[1]

The evidence amply supports the trial court's findings justifying the order requiring defendant to repay $36,312.10 given to him by plaintiff for investment. A wife clearly has the right to recover money paid to her husband with the understanding that it be repaid. Englund v. Englund, 286 Minn. 227, 175 N. W. 2d 461 (1970). While the court casts this part of its determina-

---

[1] Defendant does not challenge that plaintiff, as a nonresident of Minnesota, has a right to maintain this independent action for alimony and property division. Grodzicki v. Quast, 276 Minn. 34, 149 N. W. 2d 8 (1967).

tion in the form of a breach of an oral agreement, its award of no more than the amount found to have been turned over to defendant permits us to also regard it as a division of property acquired during coverture. As such, we find no basis to upset the ordered repayment as an abuse of judicial discretion.

Nor do we agree with defendant that the alimony award of $300 monthly following judgment is excessive. In determining the proper amount of alimony, we have held that the needs of the wife as well as the income of the husband are to be taken into account. Cooper v. Cooper, 298 Minn. 247, 214 N. W. 2d 682 (1974). Furthermore, "the alimony award should not be limited to the wife's bare necessities of life, but should be large enough to permit her to enjoy the station in life of the parties prior to the divorce." Bollenbach v. Bollenbach, 285 Minn. 418, 427, 175 N. W. 2d 148, 155 (1970). Other important considerations are enumerated in Vandewege v. Vandewege, 284 Minn. 330, 333, 170 N. W. 2d 228, 230 (1969). It has been repeatedly held, most recently in Hertz v. Hertz, 304 Minn. 144, 229 N. W. 2d 42 (1975), that an alimony award will only be altered on appeal when there is a clear showing that the lower court's discretion was abused.

At the time of trial defendant had a net worth, consisting largely of investments, in excess of a half million dollars and had an annual income during the years of the marriage ranging from approximately $24,000 to $40,000. Plaintiff's net worth was $15,000 at the time of trial and her annual income was only slightly over $15,000. There was substantial evidence that during the almost 4 1/2-year course of the marriage defendant had spent considerable additional sums for the benefit of plaintiff. These expenditures included such items as trips back and forth to Minnesota each summer, a European trip in 1971, a trip to Canada, and summer school at the University of Minnesota in 1970. Implicitly, the trial judge found that plaintiff's station in life had been improved by her marriage to defendant. It follows that a monthly alimony award of $300 was not unreasonable

when contrasted with defendant's substantial net worth and annual earnings.

Defendant also urges us to reverse the lower court's award to plaintiff of a life estate in the Rush City farm property to begin on his death. Mindful that an identical disposition of this property was contemplated by provisions of the antenuptial agreement, we review its justification and reasonableness apart from the agreement, regarding its provisions only as a factor to be considered by the court.

Under Minn. St. 518.59, a trial judge may award to one spouse up to one-half the real property of the other not acquired during coverture. In determining what amount of property is just and reasonable, the judge takes into account all the facts and circumstances established by the evidence such as the relative ages of the parties; their respective wealth; the future earning capacities of both spouses; the amount of property acquired both before and after marriage, and the prospective earning potential of such property; and the comparative abilities of the parties to care for and manage the assets. Ruprecht v. Ruprecht, 255 Minn. 80, 96 N. W. 2d 14 (1959) ; Eck v. Eck, 252 Minn. 290, 90 N. W. 2d 211 (1958).

Without reciting all of the economic circumstances of the parties, it is apparent that the lower court did not abuse its discretion in awarding plaintiff a life estate in defendant's farm property. At the time the parties were married in 1967, the farm was worth $36,000, or less than 10 percent of defendant's net worth. Additionally, the value of the life estate would be considerably less than the fee simple held by defendant. Certainly, this award cannot be characterized as that type of excessive property award meriting reversal of a trial court's discretionary authority.

Finally, we address the denial of plaintiff's claim for $700 monthly "support and maintenance" from June 1972, when defendant ceased such payment, to April 1975, the time of trial. She argues that in consideration of her marriage to defendant, she, by the antenuptial agreement, relinquished any interest in

defendant's substantial estate in exchange for his promise of support and maintenance and his relinquishment of any interest in her estate; that defendant's obligation of support was unconditional, terminating only upon his or her death; and that the terms and conditions of such an agreement, otherwise enforceable upon the death of defendant had divorce not occurred, should not be terminated as a matter of law by divorce as the trial court presumably held.

Upon these arguments plaintiff contends that the trial court erred in concluding that the provision for lifetime support did not survive the divorce. While we acknowledge that this question raised by plaintiff's amended complaint is not directly answered by our prior decisions, we decline to squarely decide the issue on this appeal for these reasons.[2] First, the antenuptial agreement read in its entirety was clearly intended to govern the rights of the parties in contemplation of a marriage terminating upon the death of either party. Neither expressly nor by reasonable implication do any of its provisions suggest that the parties considered the possibility of divorce, much less an intent that it govern their rights and obligations upon that eventuality. Sec-

---

[2] We are aware of the fact that there are cases and authorities which hold that an antenuptial agreement containing no provision to the contrary survives a subsequent divorce of the parties. See, e. g., Crise v. Smith, 150 Md. 322, 133 A. 110, 47 A. L. R. 467 (1926); Sims v. Sims, 186 Neb. 780, 186 N. W. 2d 491 (1971); In re Cavazza's Estate, 169 Pa. Super. 246, 82 A. 2d 331 (1951); 2 Lindey, Separation Agreements and Ante-Nuptial Contracts, (Rev. ed.) § 90, p. 90-72. All of these cases, however, dealt with antenuptial provisions regarding property rights. Whether a similar result is justified when dealing with support and maintenance provisions is a more complex question. While we have long favored antenuptial agreements, Appleby v. Appleby, 100 Minn. 408, 111 N. W. 305 (1907), contractual terms that encourage separation or divorce are not enforceable on public policy grounds. Englund v. Englund, 286 Minn. 227, 175 N. W. 2d 461 (1970); Clark, Law of Domestic Relations, § 1.9, p. 28. We doubt that a provision for life support in an amount which the evidence in this case would justify awarding could be regarded otherwise than encouraging divorce.

ond, the absence of any explanation by the trial court together with no indication in the record that the issue was squarely presented below permits only speculation that the trial court's denial of plaintiff's claim was based solely upon legal grounds.

Absent any factual basis that the provisions of the agreement were intended to govern upon divorce and a showing of the trial court's clear confrontation and resolution of the question sought to be presented, we believe on this record that the court's denial of plaintiff's claim can be justified on other grounds. We view it as based on a due and equitable regard of all the facts and circumstances of the case rather than upon the trial court's holding that the agreement is to be disregarded as a nullity because as a matter of law it was terminated by divorce.

Costs and disbursements are not allowed to either party.

Affirmed.

MR. CHIEF JUSTICE SHERAN took no part in the consideration or decision of this case.